UNITED STATES, Appellee

v.

JAMES M. TREDE, Airman Third Class, U. S. Air Force, Appellant

2 USCMA 581, 10 CMR 79

———

582

No. 1803

Decided May 29, 1953

COL Kenneth B. Chase, USAF, and CAPT Daniel O'Leary, USAF, for Appellant.

COL David D. Porter, USAF, and 1ST LT Anthony Ortega, Jr., USAF, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Accused was tried and convicted by a general court-martial for larceny of a camera, valued at $175.00, in violation of Article 121, Uniform Code of Military Justice, 50 U. S. C. § 715. He was sentenced to a bad-conduct discharge, total forfeitures, and confinement for one year. The findings and sentence were approved by the convening authority and the board of review affirmed. The Judge Advocate General of the Air Force certified the cause to this Court pursuant to Article 67(b)(2), Uniform Code of Military Justice, 50 U. S. C. § 654.

The facts which raise the questions certified are these: The accused pleaded guilty to the charge and specification, and persisted in his plea after being fully and fairly apprised of his rights and the legal effect of his plea. In spite of the confession of guilt, the Government elected to present its case. The evidence for the prosecution was more than adequate to establish all elements of the offense and it was unrebutted as no witnesses were called by the defense. The court-martial members were instructed on the elements which they must find present before they could return a finding of larceny. It follows that little time was needed to return the verdict. Prior to sentence and by way of mitigation and extenuation, the defense introduced testimony of three witnesses. The first two witnesses stated the accused was a good worker, and they had, in the past, considered his character and honesty to be above reproach. The third witness was a doctor assigned to the Neuropsychiatric Service at the air base. His testimony was to the effect the accused was not mentally ill in any way, but his stealing of the camera in question was an outgrowth of what he termed an "immature" reaction to prior false accusations. According to the doctor he had been informed that prior to the camera incident accused had been charged by some of his associates with taking some other objects, which in fact he had not and that he came from a family where honesty was a high virtue, and a matter of great pride. The doctor was of the opinion that the theft of the camera by the accused was taken with the attitude, "well, if that is the kind . . . they think I am, . . . I'll show them," or some attitude to that effect. Perhaps the best way to state his conclusion on the accused's mental condition is to quote one paragraph from his testimony. It is:

"Now what this means in psychiatry and in light of the whole investigation on my part of this man is: This does not mean that he is mentally ill to any extent that he requires treatment or hospitalization. It does not mean that he is unable to tell right from wrong. But it does have this implication, and we know

these things can happen, in a somewhat immature person, with a particular sensitive spot having been rubbed or irritated as this occurrence did. I would place it mainly on immaturity. I would feel that it is a type of behavior more or less isolated and a type of behavior which will never occur again as the man grows past this experience."

Because of the views expressed by this witness, the law officer concluded the matter should be pursued so he examined him further. In answer to his questions the doctor testified that at the time of the crime the accused may well have been under an "irresistible impulse" to steal the camera, but he would not express an opinion as to whether the accused was at the time of the offense charged, so far free from mental defect, disease or derangement as to be able to distinguish right from wrong and adhere to the right. The nature and tenor of this evidence caused the law officer concern as to whether an issue of insanity had arisen, and so he suggested the court adjourn and refer the matter to the convening authority for further investigation. This course was followed and three officers were appointed to examine the accused. When the court reconvened some three weeks later, it called one of the doctors who qualified as an expert in psychiatry. He gave testimony that the accused at the time of the offense was so far free from mental defect, disease, or derangement as to be able to differentiate between right and wrong and adhere to the right. However, he, in part, agreed with the other medical expert that while the accused did not require hospitalization for a mental disease, he was actuated by an irresistible impulse which grew out of his immature reaction to the prior accusations. When he was questioned as to his apparent inconsistent statement which may have arisen in attempting to satisfy both legal and medical theories, he attempted to reconcile them by stating:

"Yes, I think I can. There are individuals who are, as the dictionary would state, sane individuals, and possibly if these people were to undergo psychiatric examination to find out how sane they were, the psychiatric examination would be negative. In other words a psychiatric examination could say that this person was sane, now, that same person might turn around and perform an act that would be an irresistible type of act and immediately the question of insanity would come up. Now there is what we call moral insanity, in which people have irresistible impulses, and they are such that they can under stress and strain perform an act, at that moment, and they are not completely cognizant of it. We feel this individual performed such an act, and as the testimony brought out, he was not completely aware of the exact nature of the object he took, although he took it and was not acting, following as a normal criminal would upon stealing an object. It just does not seem to indicate that this man is what we might call a common criminal or acting like a common criminal would upon stealing an object."

After the witness concluded his testimony, defense counsel made a motion for a finding of not guilty because of insanity. The law officer then inquired if either party desired to put on any additional evidence and being assured that they did not, he instructed the court-martial members concerning the issue of insanity. He told them they could reconsider their findings of guilt, and they retired to determine the questions. They returned a verdict that the accused was sane at the time of his crime.

The Judge Advocate General of the Air Force certified two questions for determination: (1) Whether the motion for a finding of not guilty made by defense counsel after the findings were announced and after testimony as to mental responsibility had been introduced, requires the court to treat the case as one in which a plea of guilty had not been entered, and whether the court would be required in such case to reopen the case, reconsider, and vote

again on the findings, and (2) whether the court, under the circumstances of this case, properly could determine the issue of the mental responsibility finally by voting on defense counsel's motion for a finding of not guilty, which motion could be decided adverse to accused by less than two-thirds' majority required to convict.

## I

Before answering the certified procedural questions, we believe it advisable to indicate that in our ▦ opinion there was no substantial evidence of insanity and hence no need to consider a withdrawal of the plea. Under ordinary circumstances this would dispose of the case but, in hopes we may be able to assist in standardizing after plea procedure, we will set forth our views on the issue of insanity and then answer the questions.

With relation to the sufficiency of evidence of insanity it is the contention of the accused that it was substantial and required a finding by the court uninfluenced by a guilty plea. As previously suggested, we conclude otherwise, as we are concerned here only with the type of insanity which is described by the witnesses as "irresistible impulse." There are a good many jurisdictions which have refused to recognize that mental condition as a defense to a crime. Annotation 70 ALR 659; 1 Bishop's Criminal Law § 387; 1 Burdick, Law of Crime, § 213; Clark and Marshall Crimes, § 86; Herzog, Medical Jurisprudence, § 650. Were this a case of first impression we might be inclined to follow those authorities. However, it is not and this particular type of mental disease has long been a defense to a crime under military law provided it as a result of a diseased or deranged mind. Winthrop's Military Law and Precedents, 2d ed., Reprint 1920, page 294.

While we realize that the phrase "irresistible impulse" ordinarily connotes an impulse to commit a criminal act that cannot be resisted because of a mental disease which has destroyed the freedom of will, we likewise realize that experts in the medical field differ in the extent of its coverage. In this instance it appears the witnesses were using it in a manner more inclusive than is generally accepted in the legal field. This is of some importance because those jurisdictions which recognize the defense have been cognizant of the possibility of its misuse and misapplication. In virtually all cases the defense has been scanned closely to avoid that situation, and to circumscribe it within reasonable limits the legal authorities have recognized the defense only when it is shown clearly to be an outgrowth of a diseased mind. It seems reasonably certain that military law has hedged the doctrine in with the same restriction. In paragraph 120b, Manual for Courts-Martial, United States, 1951, it is stated:

". . . Thus a mere defect of character, will power, or behavior, as manifested by one or more offenses, ungovernable passion, or otherwise, does not necessarily indicate insanity, even though it may demonstrate a diminution or impairment in ability to adhere to the right in respect to the act charged. . . ."

In Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, at page 165, the framers of the Manual stated:

"1. The inability to distinguish right from wrong or to adhere to the right must be the result of mental (as distinguished from moral) defect, disease, or derangement.

\* \* \* \* \* \*

"The first proposition [quoted above] was thoroughly discussed in the 1949 Manual. The weight of authority in military as well as civil cases is that the defense of insanity with respect to lack of mental responsibility is available only where the mental condition is the result of disease, destruction, or malfunction of the mental functions as contrasted with the moral or character functions of the nervous system. This distinction becomes important when one considers the numerous psychopathic cases in which the defense of irresistible impulse might be raised. Many

**585**

psychiatrists do not hesitate to testify that a sex psychopath or any person subject to criminal tendencies cannot resist—or has tremendous difficulty in resisting—the impulse which leads him to commit a sex or other type of offense. The explanatory provisions in MCM 1949 have been of great help in keeping psychiatrists and courts from applying the irresistible impulse test to criminals who are merely antisocial."

In Clark and Marshall, Crimes, § 87, it is stated:

"Whenever irresistible impulse is relied upon as a defense, care must be taken to distinguish between *insane* irresistible impulse—that is, irresistible impulse resulting from *disease* of the mind—and mere moral perversion and passion. The expression 'moral insanity' is often used, but strictly speaking, it is not insanity at all. It is merely a perverted or abnormal condition of the moral system, where the mind is sound. It is well settled that there is no exemption from responsibility merely because of moral insanity, or because of ungovernable passion, sometimes called 'emotional insanity.'"

A very fine discussion of the subject may be found in AFM 160–42, Psychiatry in Military Law, paragraph 5 (a), wherein it is stated:

". . . The 'adhere to the right' or 'irresistible impulse' doctrine is not intended to apply to actions committed while drunk, nor to the furies and frenzies of an ill-tempered man who is free of psychosis. Nor should it be used to exculpate aggressive character or behavior disorders. Actually, the doctrine is but seldom applicable, and its application will be limited to actions committed by persons with sick minds—actions perpetrated because of those sick minds. In general, only two kinds of mental illness can be considered—compulsive psychoneuroses and psychoses . . . In consequence, for practical purposes, true irresistible impulse, or 'inability to adhere to the right' occurs only in psychotics. Since its legitimate applicability is extremely limited, the doctrine of irresistible impulse will be seldom invoked."

It must then be concluded that the psychiatrists testifying in this case were considering a form of "irresistible impulse" which did not involve a mental disease as we understand it. Their conclusions show no more than a type of moral insanity or a retarded mental condition which is described as immaturity—something akin to an aggravated spoiled child act. It would be placing a premium on defects in character to allow the accused to avoid the consequences of his acts by showing that because of mental immaturity (age undetermined) he could not resist an opportunity to teach a lesson to those who accused him. The impelling force under those circumstances would appear to be emotional rather than mental.

## II

The questions asked by The Judge Advocate General of the Air Force may be combined for answer as both deal with procedure. The provisions of the Code and Manual, supra, give extraordinary treatment to the defense of insanity. Inquiry as to an accused's mental condition may be made prior to trial, during the hearing on the merits, and, any time after conviction prior to final disposition by this Court. It may also be made the subject of a motion for a new trial, if the other conditions are present. The issue in this case was raised during the trial phase and so we will limit our discussions to the procedure during that period dealing with pre-findings and post-findings consecutively.

The Manual, supra, provides that any member of the court, prosecution or defense may request, suggest, or move that an inquiry be made into the sanity of an accused. The procedure in this event, and prior to findings of guilty, should be substantially as set forth in the Manual. The accused is presumed sane but if testimony substantially tending to prove that he was insane at the time of the offense is offered in evidence, then sanity becomes an essential issue. Procedurally, the issue might first be

determined as an interlocutory question if counsel of the accused elects to raise it either by a motion to dismiss or a motion for a finding of not guilty. The ruling on those motions is first made by the law officer subject to objection by any member of the court. If any member objects, members of the court go in closed session and decide whether to affirm or overturn the ruling of the law officer. When either of those motions goes to the court for consideration, a tie vote is a determination against the accused. Assuming there is no objection by members of the court, and that the law officer overrules the motion, then the trial proceeds. The ruling then becomes final on the particular motion, but it does not preclude the court from considering the question of sanity when ultimately deliberating on the findings of guilty. If the case reaches that stage, the court may consider insanity together with other evidence to determine the guilt or innocence of the accused. This permits an accused one, two, or three opportunities to demand a ruling on his sanity. A tie vote will be adverse to him on the first two occasions but on the last, the number of members necessary to return a finding against him will be as prescribed by the Code for the particular offense with which he is charged.

This brings us to the procedure when a plea of guilty has been entered, and the question of possible insanity is thrust into the record by way of extenuation or mitigation. Article 45 of the Uniform Code of Military Justice, 50 U. S. C. § 620, provides that if an accused, after a plea of guilty, sets up matters inconsistent with his plea, a plea of not guilty shall be entered in the record and the court shall proceed as though he had entered the latter plea. Insanity at the time of the offense, if established, would be inconsistent with the plea of guilty, and if evidence suggesting that mental condition is introduced after finding, the matter of setting aside the plea becomes of importance. In that event, the law officer should not let the plea of guilty stand. He should set it aside or permit its withdrawal and hear evidence on an interlocutory basis. If he were to proceed on that basis and find the accused insane with no court member objecting, the case should be dismissed. On the other hand, if he finds the accused sane and there is no objection by any member of the court, he may then permit the case to proceed. The case would follow the pattern outlined previously for those cases when insanity is raised before findings.

In this particular instance, part of the difficulty encountered by the law officer may be credited to the tactics employed by counsel for the accused. It was not strictly in accordance with the method we prescribe but we have grave doubts that there was any prejudice to the accused. When it became apparent to the law officer that insanity was to be an issue, he followed the provisions of the Manual without taking the precaution of withdrawing the plea. He adjourned the court and referred the matter to the convening authority for further investigation. When this was completed, the hearing continued and the evidence of the psychiatrist was taken. Apparently the law officer and defense counsel paid no attention to the fact that the accused had entered a plea of guilty. When the taking of testimony had been completed, defense counsel made a motion for a finding of not guilty based on insanity. He did not suggest that accused be permitted to withdraw his plea but rather he staked his success on that motion. Had the law officer treated this as an interlocutory matter, he could have denied it subject to objection by a member of the court and then permitted the court again to consider sanity when it considered its findings on the merits. Had the law officer adopted that procedure, the accused would have been assured of the appropriate percentage on the finding of guilt. However, the law officer apparently handled the question as a separate proceeding and he went straight to the heart of the dispute by submitting the issue direct to the court. He gave instructions on the necessary elements the court must find in order to find the accused insane and informed the court members that they could re-

consider their former findings. The court retired, deliberated on the issue, and returned a finding that the accused was sane. If this finding could be sustained on a legal basis, then there would be no just reason to set aside the plea of guilty. If the accused was sane his plea was not inconsistent as he had committed the alleged offense and there was no other defense. It does seem an unnecessary act to withdraw the plea if the accused is not insane and the court being the trier of fact should be able to decide the issue properly, but the error in the proceedings is that it permits the question of guilt to be determined on the basis of a tie vote. The court members were not precluded from considering mental illness as a defense but if they considered it in connection with other facts to determine guilt or innocence they did it with a plea of guilty influencing their deliberations. There is a possibility that either of two errors might be present in the method used and so it should be emphasized that the correct procedure is to withdraw the plea of guilty, enter a plea of not guilty, and proceed with the trial as if the latter plea had been entered.

We need not test for prejudice in this case for the reason that there was no substantial issue of sanity and what the law officer did in dealing with the claimed defense was beneficial to the accused even though not strictly appropriate.

Accordingly, and for the limited purpose of disposing of this case, the questions certified are answered in the negative. However, as to the first question, we wish to make it clear that if the evidence had properly raised an issue of insanity the motion for a finding of not guilty after findings would have required that the plea be withdrawn, a plea of not guilty substituted therefor, and the case treated as one in which a plea of guilty had not been entered. From that point forward the case would be reopened for the taking of any additional evidence and the issues submitted in accordance with the substituted plea.

The record is returned to The Judge
**588**

Advocate General for action not inconsistent with this opinion.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring in part and dissenting in part):

Two chores lie before us in this case: (1) the determination of our action on the record, and (2) the consideration of responses to two questions certified to us by The Judge Advocate General, United States Air Force. I fully concur in the major opinion's performance of the former task—for, although my brothers do not say so, I understand them to have affirmed the conviction of the accused. I also concur in the answer furnished to the first certified question. What I have to say concerning the second reply will appear hereafter.

## II

To my mind affirmance or reversal here turns solely on the question of whether any sort of issue of legal insanity was raised by the medical testimony at the trial. In my opinion none was. The most that can be said on the basis of this evidence is that, because of a recent unhappy experience reflecting on his honesty, the accused had become emotionally upset—even, for the time, perhaps, antisocial. If I am correct in this, than the law officer would not have erred in disregarding the initial post-findings medical testimony, qua insanity evidence, and—in the absence of objection—directing the court-martial to proceed immediately to its consideration of an appropriate sentence. Nothing contained in the testimony of the second medical officer either modified or added substantially to the conclusions of the first. It follows, therefore, that what was, in fact, done by the law officer was erroneous only in the very strictest sense—and merely in that it constituted an inartful procedure, doubtless based on a commendable desire to protect the interests of an accused in what was regarded as a doubtful case. Certainly it could not in any wise have prejudiced him.

## III

I concur also in the principal opinion's

provision of a safe and orderly procedure for use in cases where an issue of legal insanity is raised—and in its statement of reasons therefor. It will be remembered, of course, that all of us agree that no such issue was raised by the evidence here.

## IV

Two certified questions came to us from the service concerned:

"a. Whether the motion for a finding of not guilty made by Defense Counsel after the findings were announced and *after testimony as to mental responsibility had been introduced,* requires the court to treat the case as one in which a plea of guilty had not been entered, and whether the court would be required in such case to reopen the case, reconsider, and vote again on the findings.

"b. Whether the court, under the circumstances of this case, properly could determine the issue of mental responsibility finally by voting on Defense Counsel's motion for a finding of not guilty, which motion could be decided adverse to accused by less than two-thirds majority required to convict." [Emphasis supplied].

In the foregoing quotation of the first question, I have italicized the words, "after testimony as to mental responsibility had been introduced." I am sure that this language has reference to *the* testimony as to sanity introduced in *this* case—and so, apparently, were my brothers. On this assumption, I concur in their negative response to the inquiry—this for the reason that, as a matter of law, I do not believe that the evidence introduced an issue of sanity. Had it done so, I suspect the question would have been answered otherwise. I, at least, would have been inclined to take another view.

For myself, I would prefer not to furnish an answer to the second certified question. None, I believe, is essential to a proper disposition of the case, in view of our reply to the first, and the reasons assigned therefor. Moreover, although I suppose that a negative response is the proper one, I am not entirely sure that I recognize what the inquiry is driving at. The word "finally" and the phrase "under the circumstances of this case" constitute the source of my difficulty. I am certain that an issue of sanity may not lawfully be determined adversely to the accused, and *finally,* by a vote proportionately less than that required to convict. However, *under the circumstances of this case,* I am not really sure that this was done. In fact, I am not sure that I know *what* was done. It will be recalled that the law officer instructed the members of the court-martial, at the time he submitted to them the motion dealing with mental responsibility, that, in addition to taking action thereon, they might reconsider their earlier findings of guilty. I would prefer a problem which is cleaner-cut before I attempt to supply a solution.

## V

I am sure that none of us wishes to be understood as criticizing the law officer in this case for electing to treat the medical testimony as raising an issue of sanity. Doubtless I would have done so myself under the pressing circumstances of trial—for it was the more cautious course, and one which afforded maximum protection both to the accused and to the record. This is not to say, however, that either he or I would have been required to do so. His only mistake was that, having reached the decision he took, he followed an inappropriate procedure. However, as we have seen, no harm was done.