UNITED STATES, Appellee

v

BRUCE WILSON, GS–11, Department of the
Army, Civilian, Appellant

9 USCMA 60, 25 CMR 322

No. 9638

Decided March 28, 1958

*First Lieutenant Jerome H. Gerber* argued the cause for Appellant,
Accused.   With him on the brief were *Colonel James M. Scott, Captain
Arnold I. Melnick,* and *First Lieutenant Bert M. Gross.*

*First Lieutenant Richard W. Young* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel John G. Lee, Lieutenant Colonel Thomas J. Newton,* and *First Lieutenant Arnold I. Burns.*

*Joseph M. Snee, S.J.,* on amicus curiae brief.

*Arthur John Keeffe, Esquire,* on amicus curiae brief.

*Rear Admiral Chester Ward,* USN, and *Commander Carl B. Klein,* USNR, on amicus curiae brief.

*Lieutenant Colonel Robert W. Michels,* USAF, and *Major Fred C. Vowell,* USAF, on amicus curiae brief.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused is a civilian. He was employed by the Department of the Army in the Comptroller Division, Berlin Command. He went to Berlin on a passport accrediting him to the U. S. Commander of Berlin, and he entered and departed from Berlin at various intervals during his employment pursuant to orders issued by the military. Military housing and exchange facilities were used by him in connection with his employment and residence in Berlin. It also appears that he was not subject to the civil or criminal jurisdiction of the Berlin courts by virtue of the provisions of Allied Kommandatura Law No. 7.

On his plea of guilty, a general court-martial convicted the accused of three acts of sodomy, in violation of Article 125, Uniform Code of Military Justice, 10 USC § 925, two charges of lewd and lascivious acts with persons under the age of sixteen, and two specifications alleging the display of lewd and filthy pictures to minors, with the intent to arouse their sexual desires. It is contended that because the ▮▮▮▮▮ accused is a civilian he is not constitutionally subject to trial by court-martial. We rejected like arguments in a number of previous cases and sustained the constitutionality of Article 2(11) of the Uniform Code which subjects to trial by court-martial "persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States" and without certain other territories of the United States. United States v Burney, 6 USCMA 776, 21 CMR 98; United States v Rubenstein, 7 USCMA 523, 22 CMR 313; United States v Marker, 1 USCMA 393, 3 CMR 127.[1] The question is raised anew, however, by the decision of the United States Supreme Court in Reid v Covert, 354 US 1, 1 L ed 2d 1148, 77 S Ct 1222 (1957). In that case the Supreme Court held Article 2(11) to be unconstitutional as applied in a capital case to a civilian dependent of a serviceman who accompanies such serviceman outside the United States and the specified territories.

Writing the majority opinion for the court, Mr. Justice Black noted that the wives, children, and other dependents of servicemen could not be regarded as members of the land and naval forces, though accompanying servicemen abroad at Government expense and receiving benefits from the Government such as quarters, medical care and exchange privileges, any more than if they were "living on a military post in this country." As citizens of the United States they were entitled, in a capital case, to indictment by grand jury and to trial by a jury in a court of law, as required in the Fifth and Sixth Amendments to the United States Constitution. In the course of his opinion, Justice Black referred with approval to Colonel Winthrop's statement that no

---

[1] We prefer to reach the question of jurisdiction in this case under the provisions of subdivision 11 of Article 2 rather than consider whether the circumstances obtaining in Berlin constitute that area occupied territory, as contended by Army Government counsel. See TIAS 3425, 3427; also Reid v Covert, 354 US 1, 1 L ed 2d 1148, 77 S Ct 122, footnote 61.

statute can be framed *"by which a civilian can lawfully be made amenable to the military jurisdiction in time of peace."* Significantly, however, the Justice specifically observed that "there might be circumstances where a person could be 'in' the armed services for purposes of clause 14 [of Article 1, section 8 of the United States Constitution] even though he had not formally been inducted into the military or did not wear a uniform." Id at page 23. From the latter standpoint the critical inquiry is the nature of the civilian's "contact or relationship with the armed forces." Id at page 30.

Under clause 14 of Article 1, section 8, Congress is granted the power "to make Rules for the Government and Regulation of the land and naval Forces." In exercising its power Congress does not act as an automaton. Rather, it possesses wide discretion to determine the measures and means necessary for complete and effective use of its power. Contemporaneously with the adoption of the Constitution, Congress subjected to military law "retainers to the camp" because they were closely connected with the proper functioning of the uniformed forces in the field. Under the Uniform Code, the designation has been changed by Congress to include persons "employed" by the armed forces in foreign lands. Cogent reasons exist for the identification of such persons with uniformed personnel for the purpose of the regulation of their conduct. We discussed many of these reasons in the *Burney* case, and we need not reiterate them here. See also United States v McElroy, 158 F Supp 171 (D DC) (1958), in which Judge Holtzoff denied a petition for habeas corpus for a civilian employee convicted by an Air Force court-martial at the Nouasseur Depot, Morocco. Suffice it to say that employees of the armed forces abroad are not present with the military merely for morale or convenience. They both live and work in the military community. They are required for, and are depended upon to carry out, the assigned missions of the military forces overseas. Function-ally, as well as practically, they are either "part of the armed forces"[2] or "so directly connected with such forces"[3] as to be inseparable from them for the purpose of observing the standards of conduct prescribed by Congress for the government of the military.

In recognizing the essential oneness of service and community life between those in uniform and those out of uniform, Congress did not expand military jurisdiction "at the expense of the normal and constitutionally preferred system of trial by jury." Toth v Quarles, supra, pages 22–23. It was simply exercising its constitutional power to make rules for the government of the armed forces. We hold, therefore, that as applied to employees of the armed forces under the circumstances of this case, Article 2(11) of the Uniform Code is constitutional.

The accused also attacks the right of the military to try him on the ground that he terminated his amenability under Article 2(11) by submitting a resignation from his job. The resignation was tendered the day before trial. Charges had been served and the Article 32 pretrial investigation had been conducted almost two months earlier. Manifestly, jurisdiction over him had attached long before the tender, and the proceedings could, therefore, continue to completion. United States v Robertson, 8 USCMA 421, 24 CMR 231; United States v Rubenstein, 7 USCMA 523, 22 CMR 313.

Turning to the merits of the case, the accused contends that he was prejudiced by the law officer's failure to withdraw his plea of guilty and direct that he be tried as though he had entered a plea of not guilty. He maintains that evidence of his mental condition, which was presented during the sentence procedure, is inconsistent with his plea of guilty on four of the charges. See Article 45(a), Uniform Code of Military Justice, 10 USC § 845; United States v Trede, 2 USCMA 581, 10 CMR 79.

[2] Toth v Quarles, 350 US 11, 15, 100 L ed 8, 76 S Ct 1 (1955).

[3] Duncan v Kahanamoku, 327 US 304, 313, 66 S Ct 606, 90 L ed 688 (1946).

The evidence relied upon by the accused is in the form of a stipulation of testimony by two psychiatrists. One doctor described the accused as a "typical schizoid personality, not to be confused with schizophrenic."[4] The witness went on to say that in "the field of general behavior, sensorium, and intellectual capacities," the accused does not show "any abnormal signs." The doctor also observed that the accused's thought content and thought mechanisms were not psychotic and he found "no insight that the trouble the patient is in . . . arose from his abnormal personal troubles." Finally, the doctor said that in his opinion the accused was capable of distinguishing right from wrong and of adhering to the right at the time of the commission of the offenses and that he was able to understand the proceedings against him and to cooperate in his defense. The stipulated testimony of the second doctor is substantially to the same effect. In part, he said that the accused tended "toward and on the borderline of schizophrenia."

At the trial the accused was represented by individual civilian counsel and appointed defense counsel. In evaluating the psychiatric evidence the accused's counsel conceded that it raised no issue regarding the accused's legal responsibility for the offenses to which he pleaded guilty. Individual counsel in part said:

". . . The word 'borderline' may cause the impression that here is a man who may be insane. *The defense had definitely refrained from raising this issue; we are of the opinion that our client is sane in the legal sense* which does not mean, however, that there are grave doubts about the strong degree of mental incapacity, as you have to call these borderline cases. We cannot exactly determine the degree in percentage but we have to assume that both psychiatrists having examined the accused for several times and having him subjected even to a so-called electro-encephalogram test—to a real brain test, if they con-

cur in the opinion that this man is to be considered on the borderline between mental incapacity and capacity we know something at least. *Assuming that he is legally sane, which I do not doubt a moment,* still the degree having brought him to the borderline of schizophrenia, the degree to which he is to be considered mentally inferiorated, mentally incapacitated, seems to me a very high one. *I, therefore, consider the opinion of the psychiatrists as a most important one,* and I ask you to kindly consider this opinion as *an essential factor in determining to which extent he deserves extenuating and mitigating circumstances."* [Emphasis supplied.]

A similar situation was presented to us in United States v Hinton, 8 USCMA 39, 23 CMR 263. What we said there applies equally to this case and provides a complete answer to the accused's claim of error.

"Incidental evidence of a mental condition is not proof of the existence of the condition to that degree which the law requires before it will hold harmless a person who commits an act which, but for the condition, would be criminal. . . . In a guilty plea case we cannot disregard the probability that the accused and his counsel weighed the evidence and determined that it was inadequate for an effective legal defense or to negate the existence of a specific intent. As a result, they could well have decided to disregard the evidence in favor of the possible advantage of a guilty plea. . . . The critical question, therefore, is whether the accused and his counsel were aware of the legal effect of the evidence claimed to be inconsistent with the plea of guilty.

. . . . .

". . . Moreover, it is not contended on this appeal that the accused is anything but legally sane and fully responsible for the offenses for which he was convicted or even that he has any other meritorious

---

[4] In the lexicon of psychiatry the described condition falls into the category of behavior disorders. SR 40–1025–2, June 1949.

defense. Under the circumstances, we must conclude that the plea of guilty was not improvidently entered. Indeed, on this record it would be a 'hollow gesture' if we were to set aside the plea of guilty and order a rehearing. United States v Wright, supra, page 189."

The decision of the board of review is affirmed.

Judges LATIMER and FERGUSON concur.